IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

PAMELA BRADLEY                                                           PLAINTIFF

v.                                    Case No. 6:22-cv-06059

TRI-LAKES CASA, INC.                                                     DEFENDANT

## MEMORANDUM OPINION

Before the Court is a Motion for Summary Judgment filed by Defendant Tri-Lakes CASA,
Inc. ("Tri-Lakes").  (ECF No. 22).  Plaintiff Pamela Bradley ("Bradley") has responded.  (ECF
No. 27).  Tri-Lakes filed a reply.  (ECF No. 32).  The Court finds the matter ripe for consideration.

## I.  BACKGROUND

Plaintiff Pamela Bradley, a Black female, brings this civil rights action pursuant to Title
VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.  Bradley was employed as the Executive
Director of Tri-Lakes from September 28, 2020, until May 10, 2021, during which time she
contends she was subjected to discrimination and retaliation on account of her race.

Tri-Lakes is a non-profit organization that provides compassionate staff and volunteers to
advocate for abused and neglected children in the foster care system.  (ECF No. 24, p. 1; ECF No.
28, p. 1).  It is governed by a Board of Directors, with an Executive Director overseeing day-to-
day operations.  (ECF No. 24, p. 2; ECF No. 28, p. 2).  It is undisputed that at no point in 2019,
2020, 2021, or 2022 did Tri-Lakes employ 15 or more employees.  (ECF No. 24, p. 1; ECF No.
28, p. 2).

There are four ways for a Tri-Lakes advocate or volunteer to be appointed to a case: (1) the
judge appoints an advocate; (2) parents' counsel requests an advocate; (3) the attorney ad litem

requests an advocate; or (4) the Department of Human Services ("DHS") requests an advocate. (ECF No. 23-1, p. 1; ECF No. 24-1; ECF No. 28, p. 1; ECF No. 28-1, p. 25).  The Tri-Lakes Board of Directors did not have control over DHS, the attorneys ad litem, or the courts and could not force these entities to assign cases to CASA.  (ECF No. 24, p. 5; ECF No. 28, p. 9; ECF No. 23-2, pp. 37-38).  To be eligible for case assignments, Tri-Lakes' employees and volunteers, including the Executive Director, were required to receive 30 hours of training and be sworn in by a Judge. (ECF No. 23-1, p. 1; ECF No. 24, p. 2; ECF No. 23-2, p. 26; ECF No. 28, p. 3).

In August 2020, the Executive Director of Tri-Lakes, Lindsay Mulkey ("Mulkey"), a white female, was fired due to allegations of embezzlement.  (ECF No. 23-1, p. 2; ECF No. 24, p. 7; ECF No. 28, p. 16).  Bradley applied for the position, which was the highest paid position in the organization, and was vetted by Tri-Lakes Board President, Yvonne Dooley-Smith ("Dooley-Smith"), a fellow Black female, and Board Vice President, Stephanie Huttner ("Huttner"), a white female.  (ECF No. 24, pp. 2, 8; ECF No. 28, pp. 2, 20; ECF No. 28-1, pp. 2-4).

Bradley began her employment as the Executive Director of Tri-Lakes on September 28, 2020.  (ECF No. 23-2, p. 6; ECF No. 24, p. 2; ECF No. 28, p. 2).  She received a job description explaining the Executive Director's responsibilities regarding staff training and development; recruitment of volunteers; fundraising; and cultivating relationships with DHS, the courts, attorneys ad litem, and supporting agencies.  (ECF No. 23-2, p. 10; ECF No. 24, p. 2; ECF No. 28, p. 3).  Reporting directly to its Board of Directors, Bradley initially managed a staff of three white employees.  (ECF No. 23-2, p. 54; ECF No. 24, p. 2; ECF No. 28, p. 2; ECF No. 28-1, pp. 12-13). At that time, Tri-Lakes had offices in Malvern and Hot Springs, Arkansas.  (ECF No. 23-2, p. 22).

Due to the allegations against Mulkey, Tri-Lakes was involved in an investigation into her actions when Bradley began work.  (ECF No. 23-2, p. 15).  Although Bradley only discussed the

2

investigation with the Board, she admitted it was possible that her employees could have overhead. *Id*. at 16.

After meeting Bradley, but prior to Bradley's first day, a white employee known only as "Rebecca" resigned from her position.  (ECF No. 23-2, pp. 8-9).  On October 28, 2020, exactly one month after Bradley began, another white employee, Katie Reeves ("Reeves"), resigned due to the "current conditions."  (ECF No. 23-2, p. 59; ECF No. 24, p. 3; ECF No. 28, p. 4).  Reeves was a known friend of Mulkey's.  (ECF No. 23-2, pp. 16-17; ECF No. 24, p. 3; ECF No. 28, p. 4).  It is undisputed that Reeves never made a comment about Bradley's race; never stated she did not wish to report to Bradley; and never verbally refused to train a Black female, Cherry Wright ("Wright"), hired by Bradley shortly before Reeves' resignation.  (ECF No. 23-2, pp. 12-14, 16; ECF No. 24, p. 3; ECF No. 28, p. 4).

Jamie Moran ("Moran"), another white employee, worked out of the Malvern Office.  (ECF No. 23-2, pp. 9, 22; ECF No. 24, p. 3; ECF No. 28, p. 5).  Although undated, Moran had applied for a "Supervisor" or "Director" position at Tri-Lakes while under Mulkey's supervision.  (ECF No. 23-2, pp. 20-23, 63-70).  When Bradley became Executive Director, Moran told Bradley that Moran was supposed to be "some type of Director over the Malvern Office."  (ECF No. 23-2, pp. 9, 21).  Bradley advised Moran that they did not have such a position in the budget.  *Id*.  Thereafter, the Malvern Office was closed, and Moran began working out of the Hot Springs Office.  (ECF No. 24, p. 3; ECF No. 28, p. 5).

In October 2020, Bradley interviewed and hired Carson Taylor ("Taylor"), a white female, for the position of Retention Specialist.  (ECF No. 24, p. 3; ECF No. 28, pp. 4-5).  At some point, she also hired Kevin Parrott ("Parrott"), a white male.  (ECF No. 23-2, p. 9).

In mid-October 2020, Bradley received an email from Lauren Geier ("Geier"), CASA

Director at the Arkansas Administrative Office of the Courts, indicating that three employees of CASA for Children had agreed to serve as mentors for Tri-Lakes. (ECF No. 23-2, p. 73). Bradley acknowledged receipt of the email, stating "thank you for ALL your help in advance[.] [I]'m excited and eager to learn!" *Id.* On November 19, 2020, Geier asked to reschedule a training session she had scheduled with the Tri-Lakes staff. (ECF No. 23-2, pp. 28, 77). Despite Bradley's failure to promptly respond to Geier's attempts to reschedule the meeting, the email thread indicates that Bradley advised Geier she was available on "Friday." *Id.* at 78. Bradley was unable to say whether she and Geier met or had further communication regarding the staff meeting, admitting that she had other meetings that could have caused a conflict. (ECF No. 28-1, p. 19).

On November 23, 2020, Bradley emailed Geier indicating that Tri-Lakes' advocate supervisors, Parrott and Moran, needed the same training Taylor and Wright had completed. (ECF No. 23-2, p. 76). Geier responded, clarifying that they needed both volunteer preservice and facilitator training ("TOF"). *Id.*

On December 1, 2020, Geier advised Bradley that she had received a "concerning call from someone with Garland County DCFS (Division of Children and Family Services) with concerns" in that they had not yet met with Bradley. (ECF No. 23-2, p. 78; ECF No. 24, p. 4; ECF No. 28, p. 6). Geier inquired if Bradley had reached out to the DCFS and her local attorneys ad litem. (ECF No. 23-2, p. 78). She stressed the importance of maintaining, repairing, and building these relationships, stating, "We can have all the volunteers in the world, but it would do no good if our partnerships aren't solid." (ECF No. 23-2, p. 78; ECF No. 24, p. 4; ECF No. 28, p. 6).

Bradley sent an email to Wright, Parrott, Moran, and Taylor on December 10, 2020, concerning their handling of cases and the need to promptly update case statuses in their system after Court. (ECF No. 23-2, p. 61). She also reminded them of the confidentiality agreement they

4

had each signed and advised they were not to discuss anything or anyone, past employees included, outside of the office.  *Id*.  Bradley indicated that negativity toward the program and staff would "not be tolerated."  *Id*. at 19, 61.

That same day, Bradley fired Moran for being "verbally combative" and violating confidentiality.  (ECF No. 23-2, pp. 71-72; ECF No. 24, p. 3; ECF No. 28, p. 5).  Bradley alleged that Moran had been discussing office matters outside of the office and was very argumentative when approached about it.  (ECF No. 23-2, pp. 23-24; ECF No. 24, p. 3; ECF No. 28, p. 5).

On December 31, 2020, Attorney Brock Baker ("Baker") with DHS emailed Taylor alerting her that he had asked another DHS attorney, Kurt Meredith ("Meredith"), to subpoena Taylor for two upcoming hearings.  (ECF No. 28-1, p. 47).  In an mail response to Bradley, Meredith expressed outrage that Bradley would "demand" a subpoena for an "employee of the COURT Appointed Special Advocates."  (ECF No. 23-2, p. 79).  He stated, "[m]y office does not have the capacity, inclination, or resources to begin subpoenaing advocates or advocate supervisors for hearings.  I do not, I have not, and I will not."  (ECF No. 23-2, p. 79; ECF No. 24, p. 4; ECF No. 28, p. 7)*.*  Meredith also copied Geier, suggesting that it might be best if Bradley received "further guidance and instruction from her" rather than from him.  (ECF No. 23-2, p. 79).  Bradley admitted that Geier was able to help her get clarification on this issue.  (ECF No. 28-1, pp. 22-23).

Without giving a reason, Taylor resigned from his position as Retention Specialist at Tri-Lakes on January 15, 2021.[1]  (ECF No. 23-2, p. 60; ECF No. 24, p. 3; ECF No. 28, p. 5).

On January 19, 2021, Bradley, Dooley-Smith, and Kasi Hill ("Hill"), a white attorney ad litem for Hot Springs, had a luncheon meeting to discuss cases and volunteers.  (ECF No. 24, p. 4; ECF No. 28, p. 7; ECF No. 28-1, pp. 23-26).  Hill was not an employee of Tri-Lakes.  (ECF No.

---

[1]Taylor's e-mail contains the subject line "1-15-20" and states that his resignation is as of "1-15-20," but this appears to be a clerical error in that his e-mail was sent on January 15, 2021.  (ECF No. 23-2, p. 60).

24, p. 4; ECF No. 28, p. 7).  She requested a list of active advocates, admitting she did not know "who all [was] still volunteering."  (ECF No. 28-1, p. 24).  Hill explained that if a party felt the case would benefit from the addition of a CASA advocate, they would request that the court appoint an advocate to the case.  *Id*.  If the court granted such a request, then CASA could enter the case.  While Hill was open to the appointment of trained volunteers and advocates, she stated she would not request an advocate in any of her cases unless the advocate had been fully trained.  (ECF No. 24, p. 4; ECF No. 28, p. 7; ECF No. 28-1, p. 24).  She never expressly stated she was not willing to work with Bradley.  (ECF No. 24, p. 5; ECF No. 28, p. 8).  In response, Dooley-Smith accused Hill of racism against "the African American Executive Director and the African American Board President," arguing it could not just be about training.  (ECF No. 28-1, p. 25).  Hill denied the accusation of racism, stating there was nothing racist about having advocates who were trained in CASA's policies, court protocols, and confidentiality.  *Id*. at 26.  "[I]f the focus was truly about what's best for the kids, [Hill argued] it would easily be recognized that basic training is necessary."  *Id*.

Dooley-Smith emailed Geier on March 3, 2021, copying all Board members, to inquire whether Bradley had been offered training and, if so, what training was provided.  (ECF No. 23-2, p. 75).  Geier responded, attaching copies of the 2020 and 2021 training calendars, and identifying other training opportunities that were available through CASA's Member Portal, the Directors Listserv, BroadSource, and other CASA organizations, as well as one-on-one meetings, mentor match meetings, and onboard trainings.  *Id*. at 74.  She asked Dooley-Smith to let her know if there were specific training Tri-Lakes employees needed and she would work to "either create or coordinate an event."  *Id*. at 75.

Keri Crenshaw ("Crenshaw"), a white member of the Tri-Lakes Board of Directors,

emailed the Board of Directors on March 4, 2021, expressing her disappointment in the program and refusing to attend another meeting that lacked "specific direction." (ECF No. 23-2, p. 36; ECF No. 28-1, p. 51). She stated: "We are not doing our jobs. Period. Our CASA office personnel are not doing their jobs. We are headed to complete destruction of the program if we don't stop bickering and come up with a solution." (ECF No. 23-2, p. 36; ECF No. 28-1, p. 51). Crenshaw opined that a strong person was needed to lead the program "in both the Executive Director and the President of the Board" and advised Dooley-Smith that she "cannot do everyone's job." (ECF No. 23-2, p. 36; ECF No. 28-1, p. 51). Further, she indicated that Bradley needed to "step up and lead as well as perform her job specific tasks," insisting that their failure to set benchmarks and deadlines would be fatal to the organization. (ECF No. 23-2, p. 36; ECF No. 24, p. 5; ECF No. 28, p. 8; ECF No. 28-1, p. 51). She concluded, "If we can't do that, then we need to pass our roles onto the next generation of leaders." (ECF No. 23-2, p. 36; ECF No. 28-1, p. 51).

On March 8, 2021, after Bradley complained to the Board about the lack of cooperation from DHS and the attorneys ad litem, Dooley-Smith requested a meeting with the Garland County Dependency Neglect stakeholders (i.e., DHS, the attorneys ad litem, Members of the Board, and Bradley) to discuss case assignments, "bridge the problems we have," and "move forward and be happy about it." (ECF No. 23-2, pp. 84, 87; ECF No. 24, p. 5; ECF No. 28, p. 9; ECF No. 28-1, p. 35). The meeting with the stakeholders was held on March 11, 2021, although Dooley-Smith and attorneys Kimberly Eden and Evan Bell could not attend. (ECF No. 23-2, pp. 81-83, 85-87; ECF No. 24, p. 5; ECF No. 28, p. 9). Attorney Bell indicated he would be happy to "discuss the meeting by phone and get an overview of what was discussed." (ECF No. 23-2, p. 85). In her sworn statement, Board Member Sandra Suzanne Herron ("Herron") indicated Bradley did not meet her training requirement until March 31, 2021. (ECF No. 23-1, p. 1).

7

Seven days later, Bradley alerted Bridgette Howard ("Howard"), the Trial Court Administrator for the 18th Judicial District East that she had three people who needed to be sworn in by the court. (ECF No. 32-4, pp. 1-2). The swearing-in ceremony was scheduled for March 31, 2021, before the start of their 1:30 p.m. hearing. *Id*.

On April 14, 2021, Dooley-Smith advised Bradley and all members of the Board that she had been in contact with the State Director who advised that one of the requirements for the state grant was that the board complete "diversity training." (ECF No. 32-3, p. 1). Dooley-Smith indicated that more information would be forthcoming. She also told Bradley that they took her issues and concerns very seriously, and that the matter had "once again been escalated to the State Director and on a national level." *Id*. They were slated to discuss it at the Board meeting later that day. *Id*.

Dooley-Smith emailed Hill on April 16 to alert her that Tri-Lakes now had fully trained staff and a restructured Board of Directors who were "eager, ready, and prepared for new cases." (ECF No. 23-2, p. 90). Voicing their awareness of several abuse cases filed during the pandemic, Dooley-Smith expressed Tri-Lake's eagerness "to be the voice for those children." *Id*. Hill responded, stating she had a few orders entered in her cases replacing advocates that were no longer with the Program. *Id*. She noted Wright was listed as an advocate and Bradley was listed as an advocate supervisor. *Id*. Hill also noted a few cases in which advocates were assigned but had not prepared the necessary reports. *Id*. Three days later, Dooley-Smith asked Bradley to confirm that all reports due had been filed within 10 days of court. (ECF No. 32-5, p. 2). Bradley insisted Hill was not talking about reports from volunteers to be approved by advocate supervisors, but rather, "she was talking about the court order sent to the Judge assigning a volunteer and supervisor to a case." *Id*. at 1. Nonetheless, she told Dooley-Smith that they did not always receive

the volunteer/advocate supervisor reports 7 to 10 days prior to court. *Id*. Bradley had discussed this issue with Judge Williams, who voiced his desire to have the report at least seven days prior to the hearing. Dooley-Smith directed Bradley to have the advocates complete them if they were not timely received from the volunteers. *Id*.

On April 8, 2021, Dooley-Smith sent an email advising the Board and Bradley that she was rescheduling the mandatory Board meeting previously scheduled for that day because she and Bradley were working on a deadline for the Victims of Crime Act ("VOCA") and State grants. (ECF No. 23-2, p. 99). Board member, Gaylon Broshears ("Broshears"), sent a response indicating he would be happy to try and work out a payment plan with Blue Cross and Blue Shield for $500.00 per month, if the Board wished him to do so. *Id*. Dooley-Smith agreed it should be discussed at the Board meeting, adding they could not even meet payroll. *Id*. at 98. Thereafter, Broshears voiced his disdain that the meeting was being rescheduled with little advance notice, indicating that he had notified the two new Board members, one of which would be unable to attend the meeting as rescheduled. *Id*. at 97-98. An argument ensued between Broshears and Dooley-Smith concerning Dooley-Smith's rescheduling of the meetings, which culminated in Dooley-Smith accusing Broshears of favoring the two "new Board members" and asking that the "two new African American Board members" be shown the same courtesy other members were shown. *Id*. at 97. Broshears explained that he did not care about race and insisted they could not continue to change meeting dates "willy-nilly." *Id*. at 96. He further argued that the mere fact that one or two Board members could not be present was not a reason to change the meeting date. *Id*.

Herron voiced her understanding regarding the need for the meeting to be rescheduled, given the "amount of work and responsibility" Dooley-Smith was taking on to make sure the two grants were completed. (ECF No. 23-2, pp. 94-95). She described the on-time submission of the

grants as "paramount."

The following day, Bradley responded to the email chain, questioning why their work on the grants would not warrant rescheduling the meeting and accusing Broshears of not wanting "the African American Executive Director and African American Board President to attend the meeting." (ECF No. 23-2, p. 93). Broshears denied the accusation and maintained that an earlier email should have been sent out informing all the Board members of the change. *Id*. at 96-97.

Board member Huttner also responded, insisting that Dooley-Smith's accusations of racism and prejudice—where none existed—were "hurtful and unnecessary." (ECF No. 23-2, p. 94). Noting she was hypersensitive to racism, Huttner indicated she did not see racism "in this situation at all." *Id*. However, Dooley-Smith continued to insist that racism was afoot, maintaining "not every racism is just black, there's also women in charge." *Id*. at 93-94. She also advised Huttner "no one can tell some one else how to feel. Racism is ugly and as an African American, I know racism and live it every single day." *Id*. at 93. Dooley-Smith concluded with the statement, "God loves ALL his Children." *Id*.

On April 12, 2021, Bradley explained in an email to the Board that she had not been feeling well the previous week, but she and Dooley-Smith had met the deadline for completing both grants. (ECF No. 23-2, p. 93). She claimed to have been dealing with racism since beginning work at Tri-Lakes, insisting that Tri-Lakes was receiving cases prior to her employment and that DHS and the attorneys ad litem had communicated with the prior staff. *Id*. This allegedly stopped after she was hired. *Id*. Bradley felt the last meeting with DHS was futile and had resulted in no changes. *Id*. She alleged that Broshears had grouped the "NEW African American Board members" with her and Dooley-Smith but categorized the other board members as "New Board members," maintaining that they should all be referred to as "NEW." *Id*. Bradley also accused unnamed

Board members of wishing she would not bring up racism and fearing she would do something to the VOCA grant if they made her mad. *Id*. She insisted this was all "so transparent" and clearly on account of her skin color. *Id*. And she stressed it had to be stopped and could not go on. *Id*.

After receiving no response from the Board members by the following morning, Bradley followed up stating, "It's amazing an Executive Director sends an email and doesn't receive a response." (ECF No. 23-2, p. 92). Herron responded with acknowledgement of both Bradley and Dooley-Smith's past claims of racism and her own attempts to acknowledge it. *Id*. at 91. Herron was heartbroken for them and urged both to come to her if they ever felt she was treating them disrespectfully "in ANY way." *Id*. She expressed her gratefulness for their "tireless work advocating for these vulnerable children." *Id*. Herron insisted that the Board was in crisis and indicated she would make a motion to require all Board members to undergo training on how to identify and deal with racism and bias. *Id*.

On April 22, 2021, Bradley sent an email to the Board indicating she had experienced "racism, discrimination," and unfair treatment since beginning work at Tri-Lakes. (ECF No. 23-2, p. 102). She advised them she was filing a grievance. (*Id*.; ECF No. 24, p. 5, ECF No. 28, p. 10). The following day, Dooley-Smith replied, asking Bradley to provide specifics regarding her grievance. (ECF No. 23-2, p. 103).

On April 24, 2021, Bradley sent a second email notification of her grievance, alleging to have experienced racism, discrimination, and unfair treatment by the Board, DHS, and the attorneys ad litem in not sending her cases, as well as a lack of support from the state and national CASA organization. (ECF No. 23-2, p. 105; ECF No. 24, p. 5, ECF No. 28, p. 10).

On April 27, 2021, while Bradley was on vacation, Board member Huttner sent an email to Parrott inquiring if he and Wright were working from home or traveling. (ECF No. 23-2, p.

111).  She had stopped by the office over the last several days and discovered no one was there. *Id*.  Parrot indicated they were working from home.  *Id*.  Huttner then asked Parrott to return to the office the following day, as Tri-Lakes did not have a work from home policy.  *Id*. at 110.  She also asked him to notify Wright because she did not have her contact information.  *Id*.  Parrott forwarded Huttner's email to Bradley, who responded to Huttner stating that Wright was on medical leave and Parrot had been out of the office recruiting volunteers and attending court.  *Id*. at 109.  She went on to state that, unless she had been terminated, as Executive Director she oversaw the day-to-day operations and had given instructions to her employees.  *Id*.  Alleging another violation of policy, she advised Huttner to add retaliation to her grievance.  *Id*.

On April 29, 2021, Broshears reached out to Parrot, advising him that the Board had appointed Broshears to work with him on recruiting and training new advocates.  (ECF No. 23-2, p. 108).  He asked Parrott to provide the number and names of advocates that wished to go through training.  *Id*.  Later that day, Bradley advised Broshears that she was out on vacation and that any communication with her staff needed to go through her as per the Tri-Lakes By-Laws and Policy and Procedure Manual.  (ECF No. 23-2, p. 108).  Further, she indicated that neither Broshears nor Parrott had received any TOF training, without which they could not properly train new volunteers. *Id*. at 51-52.

Attorney Rebekah Kennedy emailed Board member Janie Evins on April 30, 2021, advising that she would be representing Bradley and indicating that a date between May 5 and 7 or May 10 and 13 would be best for a meeting to discuss Bradley's grievances.  (ECF No. 23-2, p. 107; ECF No. 24, p. 8; ECF No. 28, p. 19).  The Board promptly scheduled the meeting for May 10, 2021.  (ECF No. 23-2, p. 50; ECF No. 24, p. 8; ECF No. 28, p. 19).

On May 5, 2021, Herron went to Tri-Lakes to meet with Bradley and her staff for the first

time since being elected to the Board of Directors. (ECF No. 23-1, p. 2; ECF No. 24, p. 5, ECF No. 28, p. 10). Although Herron identified herself as a Board member, Bradley did not believe her. (ECF No. 23-2, p. 47). Herron entertained Bradley and Wright's complaints and assured both she would help them work through their issues with the Board. (ECF No. 23-1, p. 2). They both reluctantly agreed to let her help. Herron returned on May 6, 2021, with the accounting records from the CPA so she and Bradley could work together on the payroll. Bradley's tone had changed from the previous day, and she was no longer helpful. *Id*. Herron asked Bradley several times to produce documents regarding volunteers, background checks, and financial reports. *Id*. Each time, Bradley refused, claiming she had already given them to the Board. *Id*. Herron then advised Bradley, "we can do this the easy way or the hard way," meaning Bradley could turn over the records or Herron would ask the Board to make her do so. *Id*.

On May 7, 2021, Bradley emailed Evins, Huttner, and Herron, advising that Herron had come to her office twice and disrespected her in front of Wright yelling, "we can make it easy, or we can make it hard and if you make it hard you are not going to win." (ECF No. 23-2, p. 104). She further alleged that Herron repeatedly asked both she and Wright whether they were happy with their jobs and wanted to be there. In addition, Bradley said Herron asked her how long she had known Dooley-Smith, who was no longer President of the Board; indicated that Dooley-Smith had a criminal record; and accused Dooley-Smith of trying to sabotage the program. *Id*. She also told Bradley and Wright that they did not need to be speaking with Dooley-Smith, indicating that they should stop worrying about the past and "keep it moving." As a result, Bradley asked that a workplace harassment claim be added to her grievance. *Id*.

On May 10, 2021, prior to her scheduled meeting with the Board of Directors regarding her discrimination claims, Bradley resigned, effective immediately. When she resigned, Bradley

instructed Parrott to clear out her computer.  (ECF No. 23-2, p. 55; ECF No. 24, p. 8; ECF No. 28, p. 20).  When asked why she did this, she replied, "[w]hy not?  At least I didn't shred any documents."  (ECF No. 23-2, p. 55; ECF No. 24, pp. 8-9; ECF No. 28, p. 20.).

Bradley indicated that both Parrott, a white male, and Wright, a Black female, also resigned because they were unhappy with the treatment they had received.  (ECF No. 28-1, pp. 38, 44).  She later admitted, however, that Dooley-Smith worked for Parrott's father, who was a medical doctor. (ECF No. 28-1, p. 44).

Herron, a former Executive Director of Tri-Lakes, became Acting Executive Director after Bradley's resignation.  (ECF No. 23-1, p. 3).  Thereafter, she discovered Bradley had failed to recruit new volunteers; fundraise or seek out donor appeals outside of the VOCA and state grants, which only provided partial funding for the agency and did not sustain their full budget; or attend local meetings with other supporting agencies to develop needed partnerships and relationships. Further, files were incomplete, and the database was neither up to date nor correct, as is required for documentation, reporting, and grants.  *Id*. at 2.  Herron formally assumed the position of Executive Director in September 2021.  *Id*. at 3.

On October 21, 2021, Bradley filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging racial discrimination, harassment, and constructive discharge.  (ECF No. 2, p. 10; ECF No. 23-2, p. 133-134).  The EEOC dismissed her claim on February 28, 2022, because Tri-Lakes employed too few employees to be covered by the laws enforced by the EEOC, and it issued a right to sue letter.  (ECF No. 2, p. 12; ECF No. 23-2, p. 135).

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). Further, the non-movant cannot rest upon mere allegations and, instead, must meet proof with proof. *See* Fed. R. Civ. P. 56(e).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. DISCUSSION

In her Complaint, Bradley accuses Tri-Lakes of racial discrimination and retaliation against her for having opposed its discriminatory practices. (ECF No. 2). She asserts the following: employees resigned from Tri-Lakes when she was hired because of her race; DHS and attorneys ad litem refused to assign cases to Tri-Lakes due to her race; Tri-Lakes' Board of Directors created a hostile work environment and refused to come to her aid with DHS and the attorneys ad litem; Board Member, Herron threatened her in retaliation for filing her grievances; and, due to an

adverse work environment, she was forced to resign.

### A. Title VII and Employers

Title VII "provides remedies to employees for injuries related to discriminatory conduct and associated wrongs by employers." 42 U.S.C. § 2000e(b); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013). An employer is defined under Title VII as a "person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). The 15-employee threshold is an element of the Plaintiff's claim for relief. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 502 (2006); *Mason v. Invision*, LLC, 347 F. App'x 257, 258 (8th Cir. 2009) (finding that defendant was never shown to have had more than fifteen employees and thus was not an "employer" for purposes of Title VII).

Plaintiff has conceded that Tri-Lakes did not have fifteen (15) or more employees in 2019, 2020, 2021, and 2022. (ECF No. 23-2, p. 9). Further, the EEOC concluded it did not have jurisdiction over Tri-Lakes because it employed too few employees. *Id*. at 135. The Court agrees. Tri-Lakes is not an employer for the purposes of Title VII. Accordingly, Tri-Lakes is entitled to summary judgment on Bradley's Title VII claim.

### B. Discrimination Pursuant to 42 U.S.C. § 1981

Plaintiff also raises a claim of discrimination pursuant to 42 U.S.C. § 1981, which prohibits unlawful discrimination based on race, color, or national origin. Section 1981 guarantees that all persons within the jurisdiction of the United States have the same right "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . " and affords a federal remedy against racial discrimination in private employment. *Id*.; *see also Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459-460 (1975) (holding section 1981 provides

federal remedy against discrimination in private employment on basis of race).  Such claims are analyzed under the same standard as Title VII claims.  *See Collins v. Union Pacific Railroad Co.*, 108 F.4th 1049, 1052 (8th Cir. 2024) (citing *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 n. 2 (8th Cir. 2010)).  A Plaintiff may establish a violation of § 1981 through either direct or indirect evidence.

### 1. Direct Evidence of Discrimination

Direct evidence of discrimination is evidence that establishes "a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision." *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003) (quotations omitted).  It does not include "stray remarks in the workplace," "statements by non-decisionmakers," or "statements by decisionmakers unrelated to the decisional process itself."  *See Tymon v. Wells Fargo & Co.*, 462 F.3d 925, 933 (8th Cir. 2006) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 270-279 (1989) (O'Connor, J., concurring)).   Facially race-neutral statements are typically insufficient to demonstrate racial animus on the part of the speaker.  *See Putman*, 348 F.3d at 735 (noting statements that plaintiff was not "humble enough" and was "too prideful" were facially race-neutral and were not direct evidence of discrimination).  "To be entitled to direct evidence analysis, the plaintiff must present evidence of conduct or statements by person involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that the attitude was more likely than not a motivating factor in the employer's decision.  *Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 613 (8th Cir. 1988).

In the present case, the facts and circumstances Bradley relies upon to support her racial discrimination claim do not rise above speculation.  *See Hopper v. Hallmark Cards, Inc.*, 87 F.3d

983, 988 (8th Cir. 1996) (holding mere speculation is insufficient to support a reasonable inference of discrimination).  Although her predecessor, Mulkey, was white, Mulkey was discharged for embezzlement.  As such, the two are not similarly situated.  And, despite Bradley's assertions that DHS, the attorneys ad litem, and the courts were assigning cases to untrained Tri-Lakes staff under Mulkey's leadership but not hers, Bradley fails to present any evidence to support her claim.  *See* Fed. R. Civ. P. 56(e) (non-movant cannot rest upon mere allegations and, instead, must meet proof with proof).

Further, Bradley has admitted that she was the highest paid employee at Tri-Lakes, answering only to the Board of Directors and having full control over Tri-Lakes' day-to-day operations and the Tri-Lakes staff.  At no point during her employment did Tri-Lakes demote her, change her job duties, lower her pay, or terminate her employment.

Bradley contends that two white employees resigned within a month of her hire because she was Black.  The Court notes that Tri-Lakes had approximately three white employees at the time of Bradley's hire, each having been hired by Mulkey.  The evidence does show that one white employee resigned after Bradley met her but before Bradley began work.  There is, however, no evidence to indicate that her resignation was in any way related to Bradley's race.  *National Bank*, 165 F.3d at 607 (holding a case founded on speculation or suspicion is insufficient to survive a motion for summary judgment).  The second white employee, Katie Reeves ("Reeves"), resigned on October 28, 2020.  Although Bradley insists that Reeves demonstrated disdain and insubordination towards her due to her race, in her deposition, Bradley admitted that Reeves never made a comment about Bradley's race; never stated she did not wish to report to Bradley; and did not verbally refuse to train Wright, a Black employee hired by Bradley shortly before Reeves' resignation.  (ECF No. 23-2, pp. 12-14, 16; ECF No. 28-1, pp. 10-15).  There is also no evidence

that Reeves made any statements against Wright.  Considering the evidence, the Court finds that the alleged insubordination alone is insufficient to support a finding by a reasonable fact finder that an illegitimate criterion motivated Reeves' actions.  *See Putman*, 348 F.3d at 735.

Further, Reeves resigned due to "the current conditions," which Bradley insists refers to her employment as Executive Director and necessarily implies her race.  Bradley has, however, admitted knowledge that Reeves was friends with Mulkey.  (ECF No. 23-2, pp. 16-17).  And although Bradley reportedly only spoke to members of the Board about the investigation into Mulkey's actions, Bradley acknowledged it was possible that her employees overheard some of those conversations.  *Id*.  Aside from mere assertions, Bradley has failed to show a connection between Reeves' resignation and Bradley's race.

Bradley also maintains that the Tri-Lakes Board of Directors discriminated against her by failing to do more to help her perform her job duties.  Namely, she contends they failed to provide her and her staff with the required training.  Although Bradley alleges Geier failed to show up for training sessions, she has presented no evidence to substantiate her claim.  Geier did cancel a meeting in November 2020 due to a death in the family, but she attempted to reschedule in December.  (ECF No. 23-2, pp. 28-29).  The record, however, is unclear as to whether the meeting ever occurred, as Bradley could not remember.  (ECF No. 28-1, p. 19).

Bradley also testified that training was later scheduled for herself and members of the Board, but the trainer failed to show up due to bad weather.  (ECF No. 23-2, p. 44).  And, at any rate, Bradley was out sick and would not have been able to participate.  *Id*.

In March 2021, when Dooley-Smith asked Geier if Bradley had been offered training and, if so, what training was provided, Geier provided links to training calendars and identified other training opportunities available through CASA.  (ECF No. 23-2, pp. 25-27, 74-75).  She advised

Dooley-Smith that she and Taylor had attended a training session held in Nebraska.  Geier asked Dooley-Smith to let her know if Tri-Lakes employees needed any specific training, and she would work to "either create or coordinate an event."  *Id*. at 75.  While the record makes clear that Bradley did not obtain her training and get sworn in until March 31, 2021, the evidence fails to show that her failure to obtain training was racially motivated.  (ECF No. 32-4, pp. 1-2).

Admitting that Tri-Lakes did not have control over the actions of DHS, the attorneys ad litem, or the courts, Bradley still avers that their lack of cooperation with her was racially motivated.  She contends they assigned cases to Tri-Lakes under her white predecessor but were refusing to assign cases now because she was Black.  Kasi Hill ("Hill"), a white attorney ad litem, did refuse to assign cases to Tri-Lakes until its employees and volunteers had received the proper training.  (ECF No. 28-1, pp. 23-26).  And, when accused of racism against "the African American Executive Director and Board President," Hill stated that the way the files were kept under "Caucasian Executive Director Mulkey was appalling."  *Id*. at 25-26.  Hill maintained that if the children's best interest was truly their focus, it would be easy to recognize that basic training was a necessity. *Id.* at 26.  Despite Bradley's insistence that untrained advocates were receiving cases in Hot Springs, she was unable to provide any evidence that those cases were assigned by Hill. (*Id*. at 34-35; ECF No. 28-1, pp. 26-27).  *National Bank*, 165 F.3d at 607 (holding a case founded on speculation or suspicion is insufficient to survive a motion for summary judgment).

When Dooley-Smith advised Hill that Tri-Lakes had fully trained staff, Hill indicated that a few orders had been entered in her cases, replacing advocates that were no longer with the program.  (ECF No. 23-2, p. 90).  She had Wright listed as an advocate and Bradley listed as an advocate supervisor.  As such, it appears that once Bradley and her employees were properly trained, Hill began assigning them cases, negating Bradley's assertion that said refusal was racially

motivated. *See Daniels v. Dillard's, Inc*., 373 F.3d 885, 887 (8th Cir. 2004) (holding Plaintiff must present evidence, not merely speculation, of discriminatory intent).

Bradley has admitted that when she voiced her concerns about the lack of case assignments to Tri-Lakes, the Board scheduled a meeting with all the stakeholders.  When asked what else the Board could have done, Bradely merely said they could have "done more."  She has provided no evidence, however, that what the Board did was unreasonable or what else could have been done by the Board.  Given Tri-Lakes' lack of control over the other agencies, a meeting with the stakeholders to discuss the issues is likely the best they could hope to attain.  And there is certainly nothing to show that the Board's alleged failure to do "more" was in any way motivated by Bradley's race.  Accordingly, the Court finds Bradley has failed to present direct evidence of racial discrimination.

### 2.  Indirect Evidence of Discrimination

A plaintiff who cannot establish direct evidence of racial discrimination must make out a *prima facie* case under the burden-shifting framework initially set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-806 (1973).  She must show that: (1) she is a member of a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4), the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently).  *See Collins*, 108 F.4th 1052-1053; *Young v. Builders Steel Co*., 754 F.3d 573, 577 (8th Cir. 2014) (citations omitted); *See Gacek v. Owens & Minor Distrib., Inc*., 666 F.3d 1142, 1146 (8th Cir. 2012) (stating "adverse employment action" is required to establish the prima face case for retaliation).

Regardless of whether Bradley could provide sufficient evidence of the first two elements, she has not shown that she suffered an adverse employment action.  An adverse employment action is a "disadvantageous change to the compensation, terms, conditions, or privileges of

employment." *See Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir. 2024) (citing *Muldrow v. St. Louis*, 601 U.S. 346, 354-356 (2024)).

Bradley has conceded that Tri-Lakes made no changes to her duties or working conditions. She maintains, however, that her resignation constituted a constructive discharge. "Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing [them] to quit." *Baker v. John Morrell & Co.*, 382 F.3d 816, 829 (8th Cir. 2004). It requires a showing that (1) a reasonable person in their situation would find the working conditions intolerable, and (2) the employer intended to force them to quit. *Tatum v. Ark. Dep't of Health*, 411 F.3d 955, 960 (8th Cir. 2005). "[I]ntolerability of working conditions is judged by an objective standard, not the [employee's] subjective feelings." *Gartman v. Gencorp, Inc.*, 120 F.3d 127, 130 (8th Cir. 1997) (internal citation and quotations omitted). "An employee may not be unreasonably sensitive to [her] working environment. A constructive discharge arises only when a reasonable person would find [her working] conditions intolerable." *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir. 1981). The employee has an "obligation not to assume the worst and not to jump to conclusions too quickly." *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir. 1995) (citing *Smith v. Goodyear*, 895 F.2d 467, 473 (8th Cir. 1990) (citations omitted)).

Moreover, an employee who quits without giving the employer a reasonable chance to work out the problem is not constructively discharged. *See Davis v. KARK-TV, Inc*., 421 F.3d 699, 706 (8th Cir. 2005) (citing *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996); *see also West*, 54 F.3d at 498 (citing cases from other circuits). An "employee cannot recover damages for losses [she] could have avoided without risk of substantial loss or injury." *West*, 54 F.3d at 498 (citing *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1997)).

Bradley filed her first grievance on April 22, 2021. (ECF No. 23-2, p. 102). The following day, Dooley-Smith emailed her asking her to be specific about her grievance so the board could address it. *Id*. at 103. Bradley then filed her second grievance on April 24, 2021, alleging racism; discrimination; unfair treatment by the board, DHS, and the attorneys ad litem; and a lack of support from the state and national CASA organization. *Id*. at 105. Upon receipt of attorney Rebecca Kennedy's April 30, 2021 email indicating she would be representing Bradley, the Board took action to assemble Plaintiff, Plaintiff's counsel, and all the stakeholders for a meeting to address her grievances. *Id*. at 107. A meeting date of May 10, 2021, was mutually agreed upon by Bradley, her attorney, and the Board. There is no evidence to indicate that the Board's action was untimely, and Bradley makes no such assertion. On the day of the scheduled meeting and before the meeting was held, Bradley chose to resign her position. Thus, Bradley's failure to afford Tri-Lakes "a reasonable chance" to address her grievances prevents her from making out a *prima facie* case of racial discrimination. *Tidwell*, 93 F.3d at 494. Accordingly, the Court finds that Bradley has failed to show there is sufficient evidence to support a jury verdict in her favor on her discrimination claim under 42 U.S.C. § 1981, and Tri-Lakes is entitled to summary judgment on that claim.

### C. Retaliation Pursuant to 42 U.S.C. § 1981

Bradley has also asserted a retaliation claim against Tri-Lakes, contending Tri-Lakes retaliated against her for filing her grievances. Section 1981 encompasses claims for retaliation, which are also analyzed under the same standard as Title VII claims. *See Collins*, 108 F.4th at 1052 (citing *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 n. 2 (8th Cir. 2010) (discrimination and retaliation claims pursuant to § 1981 are analyzed under same framework as Title VII claims). To prevail on a retaliation claim, Plaintiff must prove: (1) she engaged in protected activity; (2) she suffered a materially adverse employment action; and (3), the materially adverse action was

causally connected to Bradley's protected activity.  *See Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (discussing materiality).  It must be shown that "the desire to retaliate was the but for cause of" the termination—that is, "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions" of the employer.  *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 352, 360 (holding retaliation claims must be proved according to traditional principles of but-for causation).  Like discrimination claims, retaliation claims can be proven via direct or indirect evidence.

### 1. Direct Evidence of Retaliation

"Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." *See Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1020 (citing *Burlington,* 548 U.S. at 68 (2006)).  Although temporal proximity to the protected conduct is some evidence to support a retaliation claim, standing alone, it is generally not direct evidence of retaliation. *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir.1999).

Here, Bradley maintains that the filing of her grievances on April 22 and 24, 2021, triggered adverse employment actions by Board members Huttner, Broshears, and Herron.  She has failed, however, to present sufficient direct evidence of retaliation to create a triable question of fact.

Three days after the filing of her second grievance, and while Bradley was out on leave, Huttner emailed Parrott asking if he and Wright were working from home or traveling.  (ECF No. 23-2, p. 111).  When Parrot stated that they were working from home, Huttner asked Parrott and Wright to return to the office the following day because Tri-Lakes did not have a work from home

24

policy.  *Id.* at 110.  Then, on April 29, 2021, while Bradley remained out on leave, Broshears emailed Parrott advising him that the Board had appointed Broshears to work with Parrot on recruiting and training new advocates.  (ECF No. 23-2, p. 108).  He asked Parrott to provide the number and names of advocates that wished to go through training.  During her deposition, Bradley admitted that the Board of Directors oversaw the Tri-Lakes staff when the Executive Director was out of the office.  (ECF No. 23-2, p. 52-53; ECF No. 24, p. 8; ECF No. 28, p. 20).  As such, Herron and Broshears had the authority to communicate with Parrott.  *See Putman*, 348 F.3d at 735. Bradley has also failed to show a causal connection between either contact and her grievances.

On May 5 and 6, 2021, Board member Herron came to the Tri-Lakes office for meetings with Bradley.  (ECF No. 23-2, p. 46-47, 104; ECF No. 28-1, pp. 42).  Bradley contends that Herron, who is white, yelled at her in front of Wright, telling her, "We can make it easy, or we can make it hard.  If you make it hard you are not going to win."  (ECF No. 23-2, p. 46-47, 104; ECF No. 28-1, pp. 42).  Bradley interpreted Herron's remarks as a threat of termination because she had filed grievances against the Board.  Herron has explained that her statement was made after Bradley repeatedly refused to turn over financial documents needed for payroll.  She insists her statement was in no way related to Bradley's grievances, but instead, related to Bradley's insubordination for refusing to produce documents for a Board member.  And emails show that Herron was sympathetic to Bradley and Dooley-Smith's discrimination claims as Herron offered to help Bradley resolve her grievances with the Board.

The mere fact that Herron became upset and yelled at Bradley less than a month after Bradley filed her grievances is not sufficient to prove retaliation.  *See Kiel*, 169 F.3d at 1136. Further, even if Herron's statement could be taken as a threat of discharge, a mere threat does not give rise to a presumption that it was retaliatory.  *Fischer v. Andersen Corp.*, 483 F.3d 553, 557

(8th Cir. 2007) (holding threat of discharge, in and of itself, does not create conditions so intolerable a reasonable person would resign). While there is no doubt Bradley did not appreciate Herron's statement, no reasonable person would conclude the perceived threat made Bradley's conditions of employment intolerable. Thus, the Court finds no direct evidence of retaliation.

### 2. Indirect Evidence of Retaliation

A Plaintiff who cannot produce direct evidence of retaliation can still defeat summary judgment by creating an inference of retaliation under the *McDonnell Douglas* burden-shifting framework. *See Pye*, 641 F.3d at 1020 (holding indirect claim of retaliation required showing of *McDonnell Douglas* framework). To prevail on such a claim, Bradley must establish a *prima facie* case of retaliation by showing the following: (1) she engaged in protected activity; (2) she suffered a materially adverse employment action; and (3) the materially adverse action was causally connected to Bradley's protected activity. *See Kim*, 123 F.3d at 1060; *see also Burlington*, 548 U.S. at 67-68 (2006) (discussing materiality).

As discussed above, Bradley has not shown that she suffered a materially adverse employment action. She conceded that Tri-Lakes made no changes to her duties or working conditions, so there was no disadvantageous change to her compensation, terms, conditions, or privileges of employment. Also, Bradley's resignation before giving Tri-Lakes a chance to address her grievances prevents her from establishing an adverse employment action. *See Tidwell*, 93 F.3d at 494. She cannot recover damages for harm she could have avoided. *See West*, 54 F.3d at 498. Accordingly, the Court finds that Bradley has not presented sufficient evidence to support a jury verdict in her favor, and Tri-Lakes is entitled to summary judgment on her § 1981 retaliation claim.

### IV. CONCLUSION

For the reasons and upon the authorities discussed above, the Court finds that Tri-Lakes' Motion for Summary Judgment (ECF No. 22) should be and hereby is **GRANTED**. Accordingly,

this case is **DISMISSED WITH PREJUDICE**.  A judgment of even date shall issue.

      **IT IS SO ORDERED**, this 30th day of September, 2024.

                                  /s/ Susan O. Hickey                 

                                  Susan O. Hickey

                                  Chief United States District Judge